**Carlos VALENCIA–LUCENA, Appellant,**

v.

**UNITED STATES COAST GUARD, FOIA/PA Records Management, Appellee.**

**No. 98–5041.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 17, 1999.

Decided June 25, 1999.

322

Jeffrey A. Rackow argued the cause as amicus curiae on behalf of appellant. With him on the briefs was Roy T. Englert, Jr., appointed by the court.

Carlos Valencia–Lucena, appearing pro se, was on the brief for appellant.

Meredith Manning, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: WILLIAMS, ROGERS and TATEL, Circuit Judges.

Opinion for the Court filed by Circuit Judge ROGERS.

ROGERS, Circuit Judge:

Carlos Valencia–Lucena appeals from the grant of summary judgment to the Coast Guard in his lawsuit under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq.*, seeking pages from the logbook of a Coast Guard cutter that seized containers of drugs dropped offshore from an airplane that he piloted. According to Valencia–Lucena's FOIA request, the Captain of the Coast Guard cutter brought the logbook to Valencia–Lucena's criminal trial and .referred to pages of the logbook in testifying to the amount of drugs. In response to his first FOIA request for the logbook pages, the Coast Guard disclosed pages from another logbook. In a second FOIA request, Valencia–Lucena attached exemplars of the pages from the logbook that he was requesting. The Coast Guard responded that there were no other responsive documents. Because the record fails to show that the Coast Guard conducted an adequate search, we reverse.

## I.

Carlos Valencia–Lucena was convicted in 1989 with four others of conspiring to possess with intent to distribute 137.2 kilograms of cocaine in violation of 21 U.S.C. § 846, and conspiring to import into the United States 137.2 kilograms of cocaine in violation of 21 U.S.C. § 963. *See United States v. Valencia–Lucena,* 925 F.2d 506, 509 (1st Cir.1991)("*Valencia–Lucena I*"). At trial the government established that the conspirators intended to transport the drugs from Columbia, South America to the United States through the Virgin Islands by retrieving containers filled with cocaine dropped offshore from an airplane. *See id.* at 510. With the assistance of an informant, the government became aware of the conspiracy, and eventually, with the

assistance of the Coast Guard, recovered 137.2 kilograms of cocaine that it claimed was dropped from a plane piloted by Valencia–Lucena on December 31, 1988. *See id.* at 509–10; *United States v. Valencia–Lucena,* 988 F.2d 228, 230 (1st Cir.1993)("*Valencia–Lucena II*"). Lieutenant Nesel, the Captain of the U.S. Coast Guard cutter MONHEGAN, participated in the seizure and testified. *See Valencia–Lucena II,* 988 F.2d at 233. According to Valencia–Lucena, Captain Nesel consulted a logbook during his testimony and the government introduced a number of pages from the logbook into evidence.

The Court of Appeals for the First Circuit affirmed his conviction but vacated his sentence of 120 months imprisonment, holding that a downward departure was improper and remanding for the district court to determine the reliability of the evidence as to the amount of cocaine. *Valencia–Lucena I,* 925 F.2d at 515–16.[1] Following a hearing in which the parties stipulated that the evidence was the same as at trial, the district court on remand found that the conspirators were responsible for 137.2 kilograms of cocaine, based on the informant's trial testimony and the amount actually recovered by the government after the arrests. *See id.* at 515; *Valencia–Lucena II,* 988 F.2d at 232–233. Denying the conspirators' discovery request (including a request for the Coast Guard's certified logbook) aimed at rebutting the government's evidence on the amount of cocaine, the district court resentenced Valencia–Lucena to 235 months imprisonment. *See Valencia–Lucena II,* 988 F.2d at 231, 233. On appeal, the First Circuit rejected various challenges to the new sentences and affirmed the denial of the discovery request, but remanded for specific findings on whether the amount of cocaine was foreseeable to other members of the conspiracy. *Id.* at 230, 233, 235.[2]

After he was resentenced, Valencia–Lucena submitted two FOIA requests to the Coast Guard, the second of which is the subject of this appeal.[3] He submitted his first FOIA request in February 1993 for copies of the MONHEGAN's logbook entries for December 25, 1988 to January 10, 1989. The Coast Guard responded in August 1993 with redacted summary sheets noting weather observations and various operations from a different logbook than he was seeking.[4]Valencia–Luce-

---

1. The offshore drop was successful, but the conspirators encountered recovery problems. Only six of ten coolers were recovered and the cocaine was subsequently turned over to the government by an informant after the arrests. *See Valencia–Lucena I,* 925 F.2d at 510. The original indictment charged law violations with regard to 200 kilograms of cocaine; the first superceding indictment charged 173.2 kilograms, and the second superceding indictment charged 132.7 kilograms, the amount actually recovered by the government. *See id.* at 515. At trial, the district court excluded the evidence of the amount of cocaine involved in the conspiracy because the government's proof of the chain of custody was weak, the evidence was unduly prejudicial, and it was unnecessary to prove the conspiracy. *See id.; United States v. Valencia–Lucena,* 988 F.2d 228, 230 (1st Cir. 1993) ("*Valencia–Lucena II*").

2. In affirming the denial of the discovery request, the First Circuit noted that at trial the conspirators had the opportunity to cross-examine the commanders of the Coast Guard and British Virgin Island police vessels, that at the remand hearing they had the opportunity to contest the government's evidence on the amount of cocaine but did not, and that they "failed to show [ ] how the logbooks would have added anything to the testimony already received." *Valencia–Lucena II,* 988 F.2d at 233.

3. In 1996, the district court denied Valencia–Lucena's collateral attack on his sentence pursuant to 28 U.S.C. § 2255 on the ground of double jeopardy, because the government had previously forfeited his residence on the basis of the conduct underlying the conspiracy charges. *Valencia Lucena v. United States,* 933 F.Supp. 129, 131 (D.P.R.1996).

4. The summary sheets show that on December 31, 1988, the MONHEGAN was en route to a "possible airdrop"; on January 6, 1989, the crew conducted a field test that was positive for cocaine on one bale and one packet; and on January 7, 1989, the MONHEGAN docked in San Juan, Puerto Rico, unloading nine bales of cocaine and transferring them to the Drug Enforcement Agency.

na therefore submitted a second FOIA request in November 1993, specifying that he wanted copies of the captain's log, deck, and/or communications logbooks from December 30, 1988 to January 8, 1989. He identified Lieutenant Nesel as the captain of the vessel during that period, and specified that he was requesting "any entry of drugs found and/or seized by this vessel, circumstances involved, type and quantity of drugs found, description of containers in which drugs were found, to whom these drugs were found and/or seized, and to which Law Enforcement agency the drugs were delivered to in San Juan, PR and/or other port of entry." He also attached logbook pages introduced by the government as evidence at trial; the exemplars appear to represent the December 31, 1988, entry of a logbook authenticated under Lieutenant Nesel's signature, showing that the MONHEGAN responded to an airdrop and met with Drug Enforcement Agency officials to search the surrounding area.

After receiving acknowledgments by the Coast Guard of receipt of his second FOIA request in December 1993 and again in January 1994, Valencia–Lucena heard nothing more for over two years. In response to his letters of February 1995 and March 1996, the Coast Guard responded in the spring or early summer of 1996, treating the March letter as if it were a new FOIA request and stating that it had no responsive documents. The Coast Guard informed Valencia–Lucena, however, that there was "a possibility that the records . . . requested/additional records responsive to [his] request may be located at the federal records center in Georgia" and provided him with the address so he could contact the center directly. Valencia–Lucena sent a letter to the Georgia center requesting the logbook documents, but received no response.

A third acknowledgment in July 1997 from the Coast Guard stated that his FOIA request would "be processed as soon as possible." After waiting nearly four years, Valencia–Lucena sought injunctive relief in the district court to compel the agency to act. Prompted by the lawsuit, the Coast Guard disclosed the same pages it had released in response to his first FOIA request and claimed "that a reasonable search for responsive records ha[d] been made and [that] no other places within the Coast Guard exist where the records are likely to be found." The district court granted the Coast Guard's motion for summary judgment, concluding that it had performed an adequate search. Valencia–Lucena appealed, and this court appointed amicus curiae.[5]

## II.

The law in this circuit on agency obligations under FOIA is long-established and embraces the congressional purpose of open government. *See Campbell v. United States Dep't of Justice,* 164 F.3d 20, 27 (D.C.Cir.1998). While recognizing that the number of requests for information may pose burdens on agencies, Congress determined its ultimate policy of open government should take precedence. *See John Doe Agency v. John Doe Corp.,* 493 U.S. 146, 151, 110 S.Ct. 471, 107 L.Ed.2d 462 (1989); *Department of the Air Force v. Rose,* 425 U.S. 352, 361, 96 S.Ct. 1592, 48 L.Ed.2d 11 (1976). The fundamental principle animating FOIA is public access to government documents. *John Doe Agency,* 493 U.S. at 151, 110 S.Ct. 471. Accordingly, this court has required agencies to make more than perfunctory searches and, indeed, to follow through on obvious leads to discover requested documents. *Campbell,* 164 F.3d at 28. An agency fulfills its obligations under FOIA if it can demonstrate beyond material doubt that its search was "reasonably calculated to uncover all relevant documents." *Truitt v. Department of State,* 897 F.2d 540, 542 (D.C.Cir.1990) (quoting *Weisberg v. Department of Justice,* 705 F.2d 1344, 1351

---

**5.** Order of August 12, 1998, *Valencia–Lucena v. United States Coast Guard,* No. 98–5041.

(D.C.Cir.1983)). "[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. United States Dep't of the Army,* 920 F.2d 57, 68 (D.C.Cir.1990) ("*Oglesby I*"). The agency "cannot limit its search" to only one or more places if there are additional sources "that are likely to turn up the information requested." *Id*; *see also Campbell,* 164 F.3d at 28.

A requester dissatisfied with the agency's response that no records have been found may challenge the adequacy of the agency's search by filing a lawsuit in the district court after exhausting any administrative remedies. *See* 5 U.S.C. § 552(a)(6)(A)(i) & (C); *Oglesby I,* 920 F.2d at 67. At the summary judgment stage, where the agency has the burden to show that it acted in accordance with the statute, the court may rely on "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby I,* 920 F.2d at 68; *see also Kowalczyk v. Department of Justice,* 73 F.3d 386, 388 (D.C.Cir. 1996); *Weisberg,* 705 F.2d at 1351. However, if a review of the record raises substantial doubt, particularly in view of "well defined requests and positive indications of overlooked materials," *Founding Church of Scientology v. National Sec. Agency,* 610 F.2d 824, 837 (D.C.Cir.1979), summary judgment is inappropriate. *Id.*; *see also Oglesby v. United States Dep't of the Army,* 79 F.3d 1172, 1185 (D.C.Cir.1996) ("*Oglesby II*"); *Krikorian v. Department of State,* 984 F.2d 461, 468 (D.C.Cir.1993); *Weisberg v. United States Dep't of Justice,* 627 F.2d 365, 369–70 (D.C.Cir.1980). Most recently, for example, in *Campbell,* 164 F.3d at 28, the court held a search inadequate when it was evident from the agency's disclosed records that a search of another of its records system might uncover the documents sought. So too here, on

de novo review, *see Nation Magazine v. United States Customs Serv.,* 71 F.3d 885, 889 (D.C.Cir.1995), the record indicates that the search was deficient and consequently summary judgment for the Coast Guard was not proper.

Noting, correctly, that the adequacy of a search is separate from the question of whether the requested logbook entries are found, *Nation Magazine,* 71 F.3d at 892 n. 7; *Meeropol v. Meese,* 790 F.2d 942, 953 (D.C.Cir.1986); *see also Perry v. Block,* 684 F.2d 121, 128 (D.C.Cir.1982), the Coast Guard refers to the declaration of Lieutenant Matthew Ross, the FOIA coordinator in the Office of Law Enforcement, Division of Drug Interdiction at Coast Guard Headquarters. He processed Valencia–Lucena's second FOIA request and re-released logbook pages of the MONHEGAN disclosed in response to the first FOIA request from December 25, 1988 through January 10, 1989, with the names of law enforcement personnel redacted and an acknowledgment that two missing pages, for December 30 and January 1, could not be located upon a further search. Lieutenant Ross attests that he searched the paper and microfiche files in the Office of Law Enforcement by date and name U.S. Coast Guard Cutter MONHEGAN. He also contacted the Federal Archives and Records Center in Bayonne, New Jersey to search for the original logbooks, but the original logbooks could not be found although they are to be maintained at the center in accordance with the Coast Guard Paperwork Management Manual, M5212.12. Finally, he directed the Coast Guard Seventh District in Miami, Florida, the MONHEGAN's home port, to search its Search and Rescue and Law Enforcement files, but the Seventh District did not find any responsive documents.

Nothing in Lieutenant Ross' declaration or the record before the court expressly demonstrates, however, that the Coast Guard focused its search on the specific document requested, as indicated by the exemplars attached to Valencia–Lucena's

second FOIA request. The nature of the precise requests to the entities within the Coast Guard is unclear. Because the agency's disclosures in response to Valencia–Lucena's first FOIA request were non-responsive, Valencia–Lucena contends that it is of some significance whether the exemplar pages were described or provided to those searching for the records, particularly in light of the fact that the only documents released in response to his second FOIA request were the same documents it had previously released. Still, we think the absence of such an express indication is not grounds for reversal inasmuch as Lieutenant Ross attached the exemplars to his declaration, thereby implicitly suggesting that his directions to those within the agency were properly focused. To conclude otherwise would burden the agency without purpose. Nonetheless, in a future declaration, further clarity on the point would eliminate any concerns.

Rather, what causes us to conclude that the search was inadequate arises from the fact that the record itself reveals "positive indications of overlooked materials." *Founding Church of Scientology*, 610 F.2d at 837; *see also Oglesby II*, 79 F.3d at 1185; *Krikorian*, 984 F.2d at 468; *Weisberg*, 627 F.2d at 369–70. First, the offices searched according to the Ross declaration were not the only places "likely to turn up the information requested." *Oglesby I*, 920 F.2d at 68, *quoted in Campbell*, 164 F.3d at 28. By letter in mid–1996, the Coast Guard informed Valencia–Lucena "that the records [he] requested/additional records responsive to [his] request may be located at the federal records center in Georgia." The Coast Guard declined to search the Georgia office and provided the address for Valencia–Lucena to contact the center directly.

Its failure to search the center it had identified as a likely place where the requested documents might be located clearly raises a genuine issue of material fact as to the adequacy of the Coast Guard's search. It is well-settled that if an agency has reason to know that certain places may contain responsive documents, it is obligated under FOIA to search barring an undue burden. *See, e.g., Campbell*, 164 F.3d at 28; *Krikorian*, 984 F.2d at 468; *Oglesby II*, 79 F.3d at 1185. Pursuant to the regulations of the National Archives and Records Administration, 36 C.F.R. § 1228.162 (1998), agency records stored at a federal record center are deemed "to be maintained by the agency which deposited the record." Therefore, the Coast Guard's failure to search cannot be excused by contending that it was not obligated to check the records center, and, indeed, the Coast Guard provides no explanation for why it did not search the Georgia facility. The Coast Guard's abdication of its duty under FOIA to perform a search of all places it knew "likely to turn up the information requested," *Oglesby I*, 920 F.2d at 68, makes clear that summary judgment for the Coast Guard was inappropriate, *cf. Krikorian*, 984 F.2d at 468.

The Coast Guard's contention at oral argument that Valencia–Lucena failed to raise the records center issue in the district court is belied by the attachments to his sworn declaration in opposition to summary judgment that were filed in accordance with the district court's instructions. *See Valencia–Lucena v. United States Coast Guard*, No. 97–1693 (D.D.C. Oct. 8, 1997). Moreover, the district court referred to the attachments in its memorandum opinion granting summary judgment. *See Valencia–Lucena v. United States Coast Guard*, No. 97–1693, slip op. at 3 (D.D.C. Dec. 18, 1997).

Second, Lieutenant Ross' declaration does not refer to Lieutenant Nesel, the Captain of the MONHEGAN at the relevant time, and there is nothing in the record to indicate that the lieutenant was contacted. Although we hardly suppose that the lieutenant retained possession of the logbook that, according to the FOIA request, he brought to Valencia–Lucena's trial, he would be a likely source for infor-

mation about what happened to that logbook. An inquiry to him gains significance in this context because the Coast Guard has no responsibility under FOIA to make inquiries of other law enforcement agencies, such as the Justice Department, for documents no longer within its control or possession. *Cf. Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 150–51, 100 S.Ct. 960, 63 L.Ed.2d 267 (1980); *National Sec. Archive v. Archivist of the United States,* 909 F.2d 541, 544–45 (D.C.Cir.1990); *Bureau of Nat'l Affairs, Inc. v. United States Dep't of Justice,* 742 F.2d 1484, 1490 (D.C.Cir.1984). It is entirely possible that Lieutenant Nesel would recall what he did with the logbook after he testified at trial, assuming the truth of Valencia–Lucena's assertion in his FOIA request. Absent any indication that an inquiry of Lieutenant Nesel would be fruitless, either because he is no longer in the Coast Guard or because the storage of the logbook was controlled by other persons or by internal procedures, such an inquiry was required. When all other sources fail to provide leads to the missing record, agency personnel should be contacted if there is a close nexus, as here, between the person and the particular record. *See Nation Magazine,* 71 F.3d 885, *on remand,* 937 F.Supp. 39, 43–44 (D.D.C. 1996). The undisputed connection between the missing logbook and Lieutenant Nesel should have led the Coast Guard to inquire of him as a source "likely to turn up the information requested," *Oglesby I,* 920 F.2d at 68, regarding the missing logbook's whereabouts.

 Finally, the Coast Guard's contention that summary judgment is appropriate because logbooks such as the one requested by Valencia–Lucena are routinely destroyed after two years is without merit. In support of its contention, the Coast Guard relies on the response of the Seventh District to Lieutenant Ross' search directive, that "[w]e forward all case files to the national archives, but they are routinely destroyed after two years."

In addition, the Coast Guard refers to a 1988 edition of the Telecommunications Manual, submitted as part of the record for the first time on appeal, setting forth the policy and procedures for the administration and operation of the Coast Guard Telecommunications Systems. Chapter 6E, pertaining to the disposal schedule of records material, provides that "[l]ogs incident to or involved in any claim or complaint of which the command has been notified," shall be destroyed "when two years old or when complaint or claim has been fully satisfied, which ever is earlier." However, the Manual also contains exceptions to the routine destruction of documents, for communications messages or logs of "historical or continuing interest," which are to be permanently maintained according to another Coast Guard Manual, M5212.12. From the bare record, we are unable to determine whether the requested logbooks might fall within these exceptions for either messages or logs. But inasmuch as the Ross declaration states that the Coast Guard searched the Bayonne, New Jersey records center because logbooks such as those requested by Valencia–Lucena are maintained there in accordance with Coast Guard Manual, M5212, the logbooks may be of the sort permanently retained. In short, generalized claims of destruction or non-preservation cannot sustain summary judgment. *See Campbell,* 164 F.3d at 28; *Weisberg,* 627 F.2d at 369.

Accordingly, we reverse the grant of summary judgment for the Coast Guard and remand the case to the district court for further proceedings.