# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

—————

Argued September 29, 2023          Decided May 17, 2024

No. 22-5281

AMERICAN OVERSIGHT,
APPELLANT

v.

UNITED STATES DEPARTMENT OF HEALTH AND HUMAN
SERVICES AND OFFICE OF MANAGEMENT AND BUDGET,
APPELLEES

—————

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00827)

—————

*Jessica Anne Morton* argued the cause for appellant. With
her on the briefs were *Katherine M. Anthony* and *Mehreen A.
Rasheed*.

*Nikhel S. Sus* was on the brief for *amicus curiae* Citizens
for Responsibility and Ethics in Washington in support of
appellant.

*Bruce D. Brown*, *Katie Townsend*, and *Adam A. Marshall*
were on the brief for *amicus curiae* The Reporters Committee
for Freedom of the Press in support of appellant.

*Benjamin M. Shultz*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, and *Mark B. Stern*, Attorney.

Before: PILLARD, WILKINS, and GARCIA, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GARCIA.

Opinion concurring in part and dissenting in part filed by *Circuit Judge* WILKINS.

GARCIA, *Circuit Judge*: The Freedom of Information Act ("FOIA") requires federal agencies to make their records available to the public, subject to nine exemptions for specific categories of material. Exemption 5 protects "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5).

This case concerns the meaning of "intra-agency." Under the "consultant corollary" to Exemption 5, first endorsed by this court in 1971, we have held that the term encompasses nearly all documents used by an agency in its deliberative process, even if the author or recipient is not an employee of that same agency. In *Department of Interior v. Klamath Water Users Protective Association*, 532 U.S. 1 (2001), the Supreme Court expressed skepticism about the breadth of that doctrine. The Court emphasized that the term intra-agency must be given "independent vitality" and suggested that Exemption 5 might extend at most to documents from outsiders that are similarly situated to agency employees in that they have no independent stake in the matter under discussion. *See id.* at 11–12.

Since *Klamath*, we have not had to decide whether agencies may invoke Exemption 5 to withhold agency records generated by a government consultant with its own stake in the outcome of the agency's decision-making process. Presented with the question, we conclude they may not.

In this case, two Executive Branch agencies invoked Exemption 5 to withhold communications with members of Congress and their staffs during negotiations over potential healthcare reform legislation. Because the record shows Congress had an independent stake in that subject and did not provide disinterested advice as an agency employee would, we conclude that Exemption 5 does not apply to the records at issue and reverse the district court.

**I**

In early 2017, House Republican leaders sought to repeal the Affordable Care Act. While the effort was gaining steam, American Oversight filed two identical FOIA requests with the Department of Health and Human Services ("HHS") and the Office of Management and Budget ("OMB"). The requests sought communications "relating to healthcare reform" between each agency and Congress. J.A. 32, 40. The agencies did not timely respond to the requests, so American Oversight filed suit in the district court, which soon ordered the agencies to make rolling productions.

The agencies made those productions for several months before reaching an impasse with American Oversight. Invoking Exemption 5, HHS and OMB refused to disclose certain communications between the agencies and Congress as "intra-agency memorandums or letters." 5 U.S.C. § 552(b)(5).

The parties filed competing motions for summary judgment on that issue. The agencies argued that Exemption 5 applied because the communications were between Trump

Administration officials and Republican members of Congress, and their staffs, who shared the "goal of repealing and replacing" the Affordable Care Act. *See* Memorandum of Points and Authorities in Support of Defendants' Motion for Summary Judgment at 20, *Am. Oversight, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 17 Civ. 827 (EGS) (DAR), 2022 WL 1719001 (D.D.C. May 27, 2022), Dkt. 25-1.

American Oversight acknowledged that, under our consultant corollary case law, Exemption 5's term "intra-agency" can be read to include some scenarios where an outside consultant assists an agency in carrying out the agency's functions. But here, it argued, the consultant corollary could not apply. According to American Oversight, Congress and its staffers were not functioning in a consultative capacity—they were negotiating with a co-equal branch of government to pass a new healthcare law, each side bringing its own interests to bear. In American Oversight's view, that certain members of Congress and the agencies shared a common goal to pass healthcare reform could not transform the cross-branch communications into "intra-agency" ones for purposes of Exemption 5.

The district court sided with the agencies and found nearly all the withholdings proper. The district court observed that in *Klamath*'s wake, district courts in this Circuit have taken different approaches to the consultant corollary's scope. Some cases have required that outside consultants lack an "independent interest" in the subject that they discuss with the agency. *See Am. Oversight, Inc.*, 2022 WL 1719001, at *13 (citing *Am. Oversight v. U.S. Dep't of Health & Hum. Servs.*, 380 F. Supp. 3d 45, 54–55 (D.D.C. 2019)). Others have protected communications with outside consultants having such an interest, so long as the consultant and agency share overriding common goals. *Id.* (citing *Jud. Watch, Inc. v. U.S.*

*Dep't of State*, 306 F. Supp. 3d 97, 111 (D.D.C. 2018)). The district court explained that depending on which line of cases it followed, the outcome here would be different. Under the first line of cases, American Oversight would win. *See id.* But under the second, the agencies would win. *See id.* The district court chose the latter course, and therefore held that the communications were protected from disclosure under Exemption 5. *See id.* at *12–15.

Separate from the Exemption 5 issue, American Oversight also challenged the adequacy of HHS's (but not OMB's) search for responsive records, arguing that HHS improperly omitted certain terms from its search. Each party moved for summary judgment, and the district court ruled for HHS. *Id.* at *11–12.

American Oversight appeals both rulings. Our review is *de novo*. *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 361 (D.C. Cir. 2021).

**II**

Congress enacted FOIA in 1966 to give the public "access to official information long shielded unnecessarily from public view." *Env't Prot. Agency v. Mink*, 410 U.S. 73, 80 (1973). The Act requires government agencies to make information available upon request unless the information is protected by one of nine statutory exemptions. 5 U.S.C. § 552(b). We recognize FOIA's "goal of broad disclosure" and give the exemptions "a narrow compass." *U.S. Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 151 (1989); *see FBI v. Abramson*, 456 U.S. 615, 630 (1982).

The agencies here have invoked Exemption 5. 5 U.S.C. § 552(b)(5). Exemption 5 protects certain kinds of agency records under two conditions. It applies to (1) "inter-agency or intra-agency memorandums or letters" that (2) "would not be available by law to a party other than an agency in litigation

with the agency." *Id.* On appeal, American Oversight does not dispute the government's claim that the second condition is satisfied because the records at issue are subject to the deliberative-process privilege, which protects certain documents used in government decision-making processes. *See Arthur Andersen & Co. v. IRS*, 679 F.2d 254, 257 (D.C. Cir. 1982).

The parties' disagreement centers instead on the first condition, which requires the records to be either "inter-agency" or "intra-agency." The parties agree that the records are indisputably not "inter-agency." Congress is explicitly excluded from the statute's definition of "agency." 5 U.S.C. § 551(1)(a). The question, then, is whether the records can qualify as "intra-agency."

One might think that the statutory text yields a straightforward "no." The communications and documents, after all, were not authored by and exchanged between a single agency's employees. But under the "consultant corollary," our court and others have long treated Exemption 5's coverage of "intra-agency" records as extending beyond just that category.

We first endorsed the corollary in *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971), to account for the reality that agencies often rely on outside experts for advice in their deliberative processes. We explained that "[t]he Government may have a special need for the opinions and recommendations of temporary consultants, and those individuals should be able to give their judgments freely without fear of publicity." *Id.* at 1078 n.44. An outsider's report can accordingly "be treated as an intra-agency memorandum of the agency which solicited it" for purposes of Exemption 5. *Id*. Other circuits followed suit. *See Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979) ("[W]e have nothing that can usefully be added to Chief

Judge Bazelon's statement in *Soucie* . . . ."); *Hoover v. Dep't of the Interior*, 611 F.2d 1132, 1138 (5th Cir. 1980).

Over the years, we applied the consultant corollary to protect records an agency exchanged with non-agency outsiders. Although our cases often cited additional considerations, the dominant one guiding the doctrine's application was whether the record was "created for the purpose of aiding the agency's deliberative process" and in fact used in that process. *Dow Jones & Co. v. U.S. Dep't of Just.*, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasis omitted). Whether "the author [was] a regular agency employee or a temporary consultant" was "irrelevant"; our focus instead was on "the role, if any, that the document play[ed] in the process of agency deliberations." *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161 (D.C. Cir. 1987).

The Supreme Court confronted the consultant corollary for the first and only time in its 2001 *Klamath* decision. *Klamath* addressed Exemption 5's applicability to documents exchanged between certain Indian Tribes and the Department of the Interior. The documents concerned water-allocation proceedings in which the Tribes sought to maximize their share of available water. *See* 532 U.S. at 5–6. Six of the seven documents were "prepared by the Klamath Tribe or its representative"; one was created by a Bureau of Indian Affairs official and sent "to lawyers for the Klamath and Yurok Tribes." *Id.* at 6.

Relying on the consultant corollary, the government argued that the documents were protected from disclosure because the Interior Department used the documents in its decision-making process, and everyone involved expected the documents to be kept confidential. *See id.* at 11. The Supreme Court did not doubt the government's claim that "confidentiality in communications with tribes is conducive to

a proper discharge" of the Interior Department's obligations as trustee for the Tribes. *Id.* Nor did it dispute that the "candor of tribal communications with the Bureau would be eroded" if the government's argument were rejected. *Id.*

The Court nevertheless rejected the government's position. "To qualify" under Exemption 5, the Court recounted, a record "must . . . satisfy two conditions," *id.* at 8: It must be protected by a litigation privilege, *and* it "must be 'inter-agency or intra-agency,'" *id.* at 9 (quoting 5 U.S.C. § 552(b)(5)). The Court explained that finding both of Exemption 5's requirements satisfied whenever a record is used in an agency's deliberative process—a precondition for the deliberative-process privilege to apply—would improperly "ignore[]" the distinct statutory requirement "that the document be 'intra-agency or inter-agency.'" *Id.* at 12. That requirement must be given "independent vitality," not treated as "a purely conclusory term, just a label to be placed on any document the Government would find it valuable to keep confidential." *Id.*

The Court assumed without deciding that some outside consultants could qualify as "intra-agency." *Id.* It observed, however, that in the "typical case[]" in which lower courts applied the consultant corollary, the "fact about the consultant that is constant . . . is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it." *Id.* at 10–11. That is, the "consultants whose communications have typically been held exempt have not been communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant." *Id.* at 12. That does not mean that the "outside consultant must be devoid of a definite point of view when the agency contracts for its services." *Id.* at 10. The key

instead is the outsider's obligations—its "only obligations" must be "to truth and its sense of what good judgment calls for." *Id.* at 11. When that is true, the Court concluded, the consultant "functions just as an employee would be expected to," *id.*, and the "consultants may be enough like the agency's own personnel to justify calling their communications 'intra-agency,'" *id.* at 12.[1]

Turning to the facts of the case, the Court held that the Tribes' communications with the Interior Department could not qualify as intra-agency. Unlike the disinterested agency consultants typically found within the scope of Exemption 5, the Tribes "necessarily communicate[d] with the Bureau with their own, albeit entirely legitimate, interests in mind." *Id.* The Court explained that "this fact alone distinguishes tribal communications from" the typical consultant corollary case. *Id.* The Court then observed that "the distinction is even sharper" because the Tribes were not only self-interested but were "self-advocates at the expense of others seeking benefits inadequate to satisfy everyone." *Id.* The Tribes, that is, were seeking to maximize their share of a finite supply of water at the expense of other interested parties. *See id.* at 5. The Court

---

[1] The Court explained in a footnote that two of our prior cases "arguably extend beyond . . . the typical examples." *Klamath*, 532 U.S. at 12 n.4. In *Public Citizen, Inc. v. Department of Justice*, 111 F.3d 168 (D.C. Cir. 1997), we held that Exemption 5 protected from disclosure communications between former Presidents and the National Archives and Records Administration, even though the Presidents had "their own, independent interests" in mind. *Klamath*, 532 U.S. at 12 n.4. And in *Ryan v. Department of Justice*, 617 F.2d 781 (D.C. Cir. 1980), we held that Exemption 5 protected from disclosure questionnaire responses that Senators provided to the Attorney General about their judicial nomination processes. Despite the Court's evident skepticism of those holdings, it did not explicitly overrule them. *See Klamath*, 532 U.S. at 12 n.4.

therefore held that the documents were not protected by Exemption 5 even though, again, it fully credited the government's "interest in frank communication" with the Tribes and its concern that disclosure would chill future communications. *Id.* at 11.

## III

Until now, we have not been required to reconcile *Klamath* with our consultant corollary precedent. In each of our post-*Klamath* cases on this subject, the outsider "did not represent an interest of its own, or the interest of any other client" when it communicated with the agency. *McKinley v. Bd. of Governors of Fed. Rsrv. Sys.*, 647 F.3d 331, 337 (D.C. Cir. 2011) (alterations and internal quotation marks omitted); *see Jud. Watch, Inc. v. U.S. Dep't of Energy*, 412 F.3d 125, 130–31 (D.C. Cir. 2005); *Nat'l Inst. of Mil. Just. v. U.S. Dep't of Def.* ("*NIMJ*"), 512 F.3d 677, 685 (D.C. Cir. 2008) (observing that "there is no dispute that the individuals [the agency] consulted were not pursuing interests of their own so as to run afoul of *Klamath*'s concern"). Since *Klamath*, in other words, we have only applied the corollary in "situations where an outside consultant did not have its own interests in mind." *Pub. Emps. for Env't Resp. v. U.S. Section, Int'l Boundary & Water Comm'n*, 740 F.3d 195, 201–02 (D.C. Cir. 2014).

This case is different. American Oversight *does* dispute whether the agency outsiders—members of Congress and their staffs—represented an interest of their own in the matters under discussion. As we explain in greater detail in Section IV of this opinion, American Oversight argues—and both the district court and we agree—that members of Congress and their staffs brought "divergent interest[s] to bear" when they engaged with the agencies concerning potential healthcare legislation. *Am. Oversight, Inc.*, 2022 WL 1719001, at \*13. As a result, and as the district court also recognized, the outcome-determinative

question is whether the consultant corollary extends beyond what *Klamath* described as the typical case. *Id.*

Presented with the question, we now follow the path marked by *Klamath*. To recap: The consultant corollary is limited to situations where the outside entity "functions just as an employee would be expected to," in the sense that the entity does not "represent an interest of its own, or the interest of any other client, when it advises the agency that [engages] it." *Klamath*, 532 U.S. at 11. This does not mean that the outsider must be "devoid of a definite point of view" when communicating on the subject at issue—the outsider's expertise and views on a subject, after all, are presumably why an agency would consult them. *Id.* at 10. Similarly, the possibility that a consultant is "paid" or "may derive intellectual satisfaction from consulting and possible adoption of their views does not mean that they have a personal or economic stake in the outcome." *Stewart v. U.S. Dep't of Interior*, 554 F.3d 1236, 1245 (10th Cir. 2009). The key is that the consultant must not have a stake in the outcome of the agency's process that would render its advice on the subject anything other than disinterested. The inquiry is whether, like an agency employee, the consultant's only "obligations are to truth and its sense of what good judgment calls for." *Klamath*, 532 U.S. at 11.

This approach accommodates our twin duties as a panel of this court to give effect to both our precedent establishing the consultant corollary and the Supreme Court's demand to give "independent vitality" to the statutory term "intra-agency." *Id.* at 12. As *Klamath* put it, when an outsider functions "enough like the agency's own personnel" in the sense described above, its communications can be regarded as "intra-agency." *Id.*

The same is not true of an outsider who is "self-interested" in the sense of having its own financial or other interest in the

outcome of the agency's process. As the Court recognized in *Klamath*, that type of outsider cannot reasonably be regarded as the functional equivalent of an agency employee working on the same matter and so is not capable of "intra-agency" communications. *Id.* Thus, an organization with water-use expertise—but whose water does not come from the Klamath Basin—could fairly be considered "intra-agency" if it prepared a report for and communicated with the Bureau of Indian Affairs on various allocation options; the organization would function like an employee with special expertise but no personal stake in the matter. But a tribe that stands to gain from the agency's eventual decisions on water use in the Klamath Basin and submits a "position paper" on the issue would not. *Id.* at 13 (internal quotation mark omitted).

The Ninth and Tenth Circuits have similarly adopted this approach to the consultant corollary following *Klamath*. *See Rojas v. FAA*, 989 F.3d 666, 674–75 (9th Cir. 2021) (en banc); *Stewart*, 554 F.3d at 1244–45. The Sixth Circuit has gone further and concluded that *Klamath* forecloses any form of the consultant corollary. *Lucaj v. FBI*, 852 F.3d 541, 548–49 (6th Cir. 2017). Meanwhile, no appellate court has adopted the alternative tests proposed by the government. And as we explain next, our adoption of the test *Klamath* suggests is reinforced by our assessment that each of the government's proposals is improper.

The government first urges that Exemption 5 covers any document, including those created by non-agency personnel, that the agency considered as part of its deliberative process. *See* Gov't Br. 20, 29. After *Klamath*, that cannot be the test. Indeed, the government urged a similar approach in *Klamath* itself, and the Supreme Court rejected it. *See* 532 U.S. at 11–12. Again, that approach would deprive the first condition in Exemption 5—the requirement that the communication be

"intra-agency"—of any "independent vitality." *Id.* at 12. Like the Court in *Klamath*, we have no reason to doubt the government's assertions that allowing disclosure of certain communications between Executive Branch agencies and Congress may chill the candor and extent of such discussions. *See* Gov't Br. 5–6. But we are not at liberty to disregard either *Klamath* or the statutory text. To the extent any of our pre-*Klamath* precedents supported the government's broad any-deliberative-document test, they are no longer good law. *See, e.g.*, *Dellums v. U.S. Nuclear Regul. Comm'n*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988) ("[A] circuit precedent eviscerated by subsequent Supreme Court cases is no longer binding on a court of appeals.").[2]

The government next argues that if *Klamath* has any effect on our precedent, it is only to create an exception based on the specific facts of that case. The government therefore suggests that documents used in an agency's deliberative process are always protected unless generated by or exchanged with outsiders who were not just "self-advocates," *Klamath*, 532 U.S. at 12, but who were also operating "at the expense of others," *id.*, and thus "necessarily adverse" to competitors outside the agency, *id.* at 13.

It is certainly true that *Klamath* dictates that such facts take documents outside of Exemption 5's protection. But nothing in *Klamath* instructs or even suggests that those facts constitute the proper test for determining whether a record is "intra-agency" generally. Instead, the opinion clarified that the fundamental distinction rendering the Tribes unlike agency

---

[2] We have no occasion to revisit whether our two cases the Supreme Court identified as extending beyond the "typical" consultant corollary scenario were correctly decided on their facts. *See Klamath*, 532 U.S. at 12 n.4 (discussing *Public Citizen*, 111 F.3d 168 and *Ryan*, 617 F.2d 781).

personnel in the relevant respect was that they "necessarily communicate[d] with the Bureau with their own . . . interests in mind." *Id.* at 12. The additional fact that the Tribes were advocating for finite benefits at the expense of others served only to make the distinction from agency personnel "even sharper." *Id.*; *see also id.* at 12 n.4 ("[T]he intra-agency condition excludes, *at the least*, communications to or from an interested party seeking a Government benefit at the expense of other applicants." (emphasis added)).

Moreover, no appellate court in the roughly twenty-three years since *Klamath* has adopted that case's specific facts as a generally applicable test. We can readily see why. The government offers no explanation of how using the facts of *Klamath* as the test for Exemption 5's coverage would bear any relationship to the statutory requirement that the record at issue be "intra-agency." As already explained, requiring the outsider to lack a stake in the outcome of the agency's decision is a sensible application of that term, because then the outsider may function "just as an employee" inside the agency "would be expected to." *Id.* at 11. The government ventures no theory of how an outsider *with* a stake in the outcome could ever be regarded as sufficiently analogous to agency personnel to fit within the statutory text. Nor does it provide any reason that the test should turn on whether that outsider is also competing with other agency outsiders for a finite benefit.

Finally, the agencies note that Congress consciously designed FOIA to ensure that congressional documents would be exempt from disclosure. Congress, as noted, is specifically exempted from the definition of "agency" in 5 U.S.C. § 551(1)(a), which identifies the entities subject to the statute's disclosure requirements. Nothing about today's decision changes the fact that Congress itself is not subject to FOIA requests. Instead, a FOIA request can reach only "agency

records." 5 U.S.C. § 552(a)(4)(B); *see Burka v. U.S. Dep't of Health & Hum. Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996). Whether a document constitutes an "agency record" depends on a "'totality of the circumstances' test that 'focuses on a variety of factors surrounding the creation, possession, control, and use of the document by an agency.'" *Cause of Action Inst. v. Off. of Mgmt. & Budget*, 10 F.4th 849, 855 (D.C. Cir. 2021) (alterations omitted) (quoting *Bureau of Nat'l Affs., Inc. v. U.S. Dep't of Just.*, 742 F.2d 1484, 1490, 1492 (D.C. Cir. 1984)). A record from Congress does not become an "agency record" just because it comes into the agency's possession if, for example, "Congress manifested a clear intent to control the document." *United We Stand Am., Inc. v. I.R.S.*, 359 F.3d 595, 597 (D.C. Cir. 2004). On appeal, the agencies have not disputed that each of the communications at issue are agency records subject to FOIA.[3]

Our dissenting colleague would rule that all communications between agencies and Congress regarding potential legislation are protected by Exemption 5, but he would do so on grounds entirely different from those the government offers. Unlike the government, the dissent argues that this case is not governed by the consultant corollary or *Klamath* at all. Instead, the dissent contends that its broad position is dictated by *Rockwell International Corp. v. Department of Justice*, 235 F.3d 598 (D.C. Cir. 2001), *Murphy v. Department of Army*, 613 F.2d 1151 (D.C. Cir. 1979), and

---

[3] In the district court, the United States House Committee on Ways and Means intervened and moved for summary judgment against American Oversight. The Committee argued that four records—all email chains with the agencies—were congressional records not subject to disclosure under FOIA. HHS and OMB opposed. The district court denied the Committee's motion as moot when it ruled that Exemption 5 protected the communications from disclosure. We express no view on the merits of any such challenge.

the text of 5 U.S.C. § 552(d). But—as the government's failure to make this argument suggests—those cases and Section 552(d) do not address, much less control, the question here.

In *Rockwell* and *Murphy*, there was no dispute that the documents at issue were intra-agency or inter-agency records and therefore satisfied Exemption 5's threshold requirement. *See Rockwell*, 235 F.3d at 604; *Murphy*, 613 F.2d at 1154. That framing made sense, because the documents at issue were confidential memoranda and reports that were prepared and finalized within an agency or agencies and only later shared with Congress. *See Rockwell*, 235 F.3d at 601; *Murphy*, 613 F.2d at 1153–54. The disputed question in those cases was instead whether the agencies subsequently waived Exemption 5's protection by sending those documents to Congress. We answered no, drawing in part on 5 U.S.C. § 552(d), which states that "[t]his section is not authority to withhold information from Congress." Because Congress had "carve[d] out for itself a special right of access to privileged information" in Section 552(d), we rejected a waiver rule under which "every disclosure to Congress would be tantamount to a waiver of all privileges and exemptions" available to executive agencies. *Rockwell*, 235 F.3d at 604 (quoting *Murphy*, 613 F.2d at 1155–56).

Unlike in *Rockwell* and *Murphy*, the disputed question in this case is Exemption 5's threshold requirement—whether the communications between the agencies and Congress are intra-agency documents. The parties do not raise or discuss the possibility of waiver. That framing again makes sense, given the nature of the documents at issue here: Communications generated through the iterative back-and-forth between the agencies and Congress. *See, e.g.*, Gov't Br. 2 (framing the issue on appeal as "[w]hether the withheld communications fall within Exemption 5's protection of inter- and intra-agency

records"). Contrary to the dissent, that question is governed by the consultant corollary and *Klamath*, which dealt with "tribal communications with the Bureau," 532 U.S. at 11, not by cases addressing waiver or by Section 552(d). This opinion does not affect *Murphy*, *Rockwell*, or the government's ability to argue, in a future case involving cross-branch interaction, that documents withheld under FOIA Exemption 5 were initially intra-agency or inter-agency and that the analysis should be framed in terms of whether the government waived those protections. But the government, for good reason, has not attempted to frame the communications at issue in this appeal in that way.

This case also does not address the question—also raised only by the dissent—whether an agency's communications with the President are "intra-agency" or "inter-agency," because the only communications at issue here are those between Congress and agencies, not the President or his staff and the agencies. *See* Dissenting Op. 5–6 (citing *Mink*, 410 U.S. at 85).

If, as the government and the dissent fear, neither Exemption 5 nor any other exemption covers "records whose release would threaten . . . vital interests, the Government may of course seek relief from Congress. All we hold today is that Congress has not enacted the FOIA exemption the [agencies] desire[]. We leave to Congress, as is appropriate, the question whether it should do so." *Milner v. Dep't of Navy*, 562 U.S. 562, 581 (2011) (citation omitted).

## IV

Under the post-*Klamath* analysis, the communications between the agencies and Congress here are not covered by Exemption 5. As *Klamath* explained, the hallmark of a consultative relationship is that the outside entity is not

"communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant." 532 U.S. at 12. When that is true, the outsider functions "just as an employee would be expected to." *Id.* at 11.

Cases in which members of Congress or their staffs could fit that description may be rare. Congress and the Executive Branch, of course, "have an ongoing institutional relationship as the 'opposite and rival' political branches established by the Constitution." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2033–34 (2020) (quoting The Federalist No. 51, at 349 (John Madison) (J. Cooke ed. 1961)). And Congress has a particular institutional stake in the legislative process. *Cf. Gravel v. United States*, 408 U.S. 606, 616 (1972) ("The Speech or Debate Clause was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch."). When members of Congress and their staffs engage with executive agencies concerning legislation, they are almost inevitably acting on behalf of interests other than those of the agencies, including those of Congress as an institution and those of their constituents.

This case, however, does not require us to decide—and we do not decide—whether members of Congress or their staffs could ever satisfy the post-*Klamath* consultant corollary requirements. In this case, the record makes clear that in the communications between the agencies and Congress, each side had an independent stake in the potential healthcare reform legislation under discussion.

The agencies' own declarations reveal this dynamic. OMB's declarant stated that it "sought to influence and shape pending legislation by discussing, consulting, and negotiating

with Congressional personnel." J.A. 115 ¶ 20. The declarant similarly stated that some communications between "the Administration and Congress . . . discussed areas where they agreed and sources of ongoing disagreement." J.A. 113 ¶ 16. For example, OMB withheld an email exchange "arranging a meeting between Administration officials and strategically selected House members. This exchange was part of the Administration's development of their legislative strategy with respect to the health care bill (e.g. which members may be supportive and which were unlikely to be)." J.A. 463. An HHS declarant explains that the agency engaged in "deliberations" with Congress, J.A. 205 ¶ 11, to "monitor and build support for the" reform effort, J.A. 206 ¶ 16.[4] HHS thus withheld an email exchange that would reveal the agency's "best strategy" "to assist with the legislation and be involved in the health care reform process." J.A. 165.

---

[4] The declarations also state that the agencies' deliberations with Congress informed the agencies' own thinking in providing advice and recommendations within the Executive Branch. *See, e.g.*, J.A. 110–11 ¶ 10 (OMB used the "communications" "to provide the President with analysis and recommendations regarding the [American Health Care Act] and other proposed health care reform legislation"); J.A. 205 ¶ 13 (HHS used the "discussions" to inform "HHS'[s] process for evaluating the potential rulemakings and operational changes that might be necessary if a bill passed"). But the agencies' subsequent planning and advice-giving processes do not transmute the communications between the agencies and Congress into intra-agency materials. If agency officials instead created records to memorialize their own internal deliberations during their negotiations with Congress, those records might be properly classified as intra-agency and protected by Exemption 5— indeed, certain documents withheld here may fit that description. *See, e.g.*, J.A. 154 (row 3). In fact, per *Rockwell* and *Murphy*, records like those might even retain their protected character if they were later shared with congressmembers per Congress's right of access.

An agency would not develop a "strategy" to "negotiate" with and "advocate" to outsiders to garner their "support" if those outsiders were analogous to an employee or a disinterested consultant without its own independent stake in the matter. At least where agencies and Congress engage in back-and-forth negotiations and related communications over the substance of potential legislation, Congress is plainly "represent[ing] an interest of its own"; otherwise, there would be no cause to negotiate. *Klamath*, 532 U.S. at 11. The members of Congress and their staffs certainly had "obligations to truth and [their] sense of what good judgment calls for." *Id.* But *Klamath* makes clear those must be the consultant's "only obligations," and that is not true here. *Id.*

This case meaningfully differs from cases like *McKinley*, 647 F.3d 331, in which this Court held, after *Klamath*, that communications between the Board of Governors of the Federal Reserve System (an agency) and the Federal Reserve Bank of New York (a private corporation) about a loan were protected by the consultant corollary. The Reserve Bank was an "operating arm" of the Board and, although it had a duty to develop its own view of whether the loan should be made, it did not "represent an interest of its own, or the interest of any other client," when it did so. *Id.* at 337 (quoting *Klamath*, 532 U.S. at 11). For the reasons described above, the negotiations here over the shape of potential legislation between the agencies and Congress are not analogous.

The district court, for its part, recognized that "the records at issue would lose their Exemption 5 protection" if—as we hold today—*Klamath* requires that the "non-agency interlocutor must bring *no* divergent interest to bear." *Am. Oversight, Inc.*, 2022 WL 1719001, at *13. The government resists that conclusion, but its arguments are mistaken.

As it argued in the district court, the government insists that Congress was not "self-interested" in the relevant sense because the agencies were part of the Trump Administration and communicated with "like-minded allies in Congress" who "shared the common goal of enacting health care reform legislation." Gov't Br. 24–25. Our dissenting colleague endorses this argument. Dissenting Op. 12–14. But that argument misunderstands the inquiry. The question for purposes of the consultant corollary is not whether the agency and non-agency share a common goal or interest at some level of generality. The question, instead, is whether the outsider is *dis*interested—whether it comes to the table with no obligation or stake in the outcome of an agency's process other than a duty to provide good advice to the agency, just as the agency's own personnel is expected to. *Klamath*, 532 U.S. at 11–12. Indeed, in *Klamath* the government acted as trustee for the Tribes and indisputably had substantially common goals and interests, but the Tribe's independent interest in the water-allocation proceeding disqualified its communications from Exemption 5's protection. *Id.* at 5 (agency "filed claims on behalf of the Klamath Tribe alone in an Oregon state-court adjudication intended to allocate water rights"). Similarly, here, a health insurance company could have shared the administration's goal of enacting healthcare reform legislation but could not qualify as an "intra-agency" consultant given its independent financial interest in the substance of any legislative reform.

The government and dissent also note that members of Congress, like the President, take oaths to defend the Constitution of the United States. Gov't Br. 24; Dissenting Op. 12. If we declared this common obligation enough to trigger Exemption 5, we would be rewriting the statute to cover all "intergovernmental" communications rather than all "inter-agency or intra-agency" ones. The Supreme Court has cautioned against "taking a red pen to the [FOIA] statute" by

"'cutting out some' words and 'pasting in others.'" *Milner*, 562 U.S. at 573 (quoting *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 845 (D.C. Cir. 2010)).

At bottom, the government bore the burden of establishing that Exemption 5 applies. *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011). Yet it did not submit any evidence showing that the relevant congressmembers and their staffs were functionally acting as agency employees. Instead, as we have explained, the record in this case shows that those who communicated with HHS and OMB about potential healthcare reform legislation had an independent stake in the matter.

The dissent disputes this analysis, asserting that it should be dispositive that American Oversight introduced "no evidence" to show this independent stake, Dissenting Op. 13, and failed to properly dispute before the district court the agencies' factual claim that they and Congress "shared a common interest in enacting health care reform legislation," *id.* at 13–14; *see* J.A. 214–15.

That assertion ignores the essential aspects of our reasoning. As we have explained, the government bore the burden to show Exemption 5's applicability. It chose to submit evidence relevant to its preferred legal rule but did not introduce evidence that could meet its burden under the reading of *Klamath* we endorse today, even though American Oversight advocated for that rule below. And the evidence the government did introduce shows the disqualifying independent stake. *See supra* at 19–21. Indeed, the district court itself, though it adopted the government's rule, recognized that American Oversight would prevail on this record if American Oversight's reading of *Klamath* governed. *See Am. Oversight, Inc.*, 2022 WL 1719001, at *13.

The communications at issue do not qualify as "intra-agency memorandums or letters" under Exemption 5.

**V**

American Oversight also appeals the district court's grant of summary judgment to HHS on the adequacy of its search for responsive records. Our review is *de novo*. *Reps. Comm. for Freedom of the Press*, 3 F.4th at 361.

HHS bears the burden of showing "beyond material doubt that its search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting *Truitt v. U.S. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990)). "The adequacy of the search" turns on "a standard of reasonableness and depends . . . upon the facts of each case." *Weisberg v. U.S. Dep't of Just.*, 745 F.2d 1476, 1485 (D.C. Cir. 1984). An agency can meet that burden by submitting "reasonably detailed, nonconclusory affidavits," *id.*, that explain "the scope and method of the search [it] conducted," *Morley v. CIA*, 508 F.3d 1108, 1121 (D.C. Cir. 2007) (quotation marks omitted). These affidavits are accorded a presumption of good faith that cannot be rebutted by "speculative claims about the existence and discoverability of other documents." *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981). Even otherwise-adequate affidavits, however, can be rebutted by "positive indications of overlooked materials." *Valencia-Lucena*, 180 F.3d at 327 (quotation marks omitted).

Based on the specific facts before us, we conclude that HHS failed to meet its burden and that American Oversight is entitled to summary judgment on this issue.

American Oversight's FOIA request sought records "relating to health care reform." J.A. 131. HHS used three search terms in its efforts to locate responsive documents:

"health care reform," "ACA," and "AHCA." J.A. 122–23 ¶¶ 16–17. "ACA" stands for Affordable Care Act, the healthcare law then in effect. "AHCA" stands for American Health Care Act, the name of the primary bill then under consideration on Capitol Hill. In American Oversight's view, HHS should also have searched for the unabbreviated names of those statutes, plus the terms "Obamacare" and "repeal and replace." American Oversight requested an additional search along these lines, but HHS maintained its view that it had conducted an adequate search. *See* J.A. 51.

Agencies are not invariably required to search their records using the terms proposed by the FOIA requestor, as long as the search terms they do use are "reasonably calculated to uncover all relevant documents," *Valencia-Lucena*, 180 F.3d at 325. *See, e.g.*, *Physicians for Hum. Rts. v. U.S. Dep't of Def.*, 675 F. Supp. 2d 149, 164 (D.D.C. 2009); *Liberation Newspaper v. U.S. Dep't of State*, 80 F. Supp. 3d 137, 146 (D.D.C. 2015) (quoting *Physicians for Hum. Rts.*, 675 F. Supp. 2d at 164).

At the same time, as several district courts in this Circuit have concluded, this discretion does not permit an agency to omit from their search obvious alternative terms without a detailed justification. *See, e.g.*, *Am. Oversight v. OMB*, 613 F. Supp. 3d 219, 227–28 (D.D.C. 2020) (searching "FBI HQ" and "FBI Headquarters" but not "JEH," the abbreviation for the J. Edgar Hoover FBI building, is unreasonable); *Bagwell v. U.S. Dep't of Justice*, 311 F. Supp. 3d 223, 230 (D.D.C. 2018) ("Because it is likely that emails concerning the investigation would use 'PSU' or 'Penn State' rather than the full name of the University, the Department's search was not reasonably calculated to find all responsive emails."); *Gov't Accountability Project v. U.S. Dep't of Homeland Sec.*, 335 F. Supp. 3d 7, 11–12 (D.D.C. 2018) (similar). Thus, even if the

search terms used "reveal many [documents] responsive" to a request, it is possible that "omitting from the search an alternative name by which the subject of the search is known renders the search inadequate." *Utahamerican Energy, Inc. v. Mine Safety & Health Admin.*, 725 F. Supp. 2d 78, 84 (D.D.C. 2010).

That is the situation here. The agency's affidavit sufficiently explains why it searched for "health care reform," "ACA," and "AHCA." HHS says it searched "health care reform" because it appeared in American Oversight's request. J.A. 122 ¶ 16. And it searched "ACA" and "AHCA" because those laws "represented the state of the health care reform legislative process at the time[,] and the search terms are frequently used in their abbreviated forms in the day-to-day operations of [the] Department." J.A. 123 ¶ 17.

But on the terms left out of the search, the agency's affidavit is vague and conclusory. HHS's declarant explained that the abbreviated versions "are frequently used in the day-to-day operations" within the agency, "as opposed to the unabbreviated versions," and states that those terms "were therefore reasonably likely to locate responsive records." J.A. 122 ¶ 16. The declarant continued that "[i]t is reasonably likely that the use of more general terms would have resulted in an excessive number of records that would have been labeled 'potentially responsive,' which [HHS] would have had to review and process, without a meaningful increase in the likelihood of identifying additional records that were actually responsive." *Id.* The affidavit also states that HHS "determined that any potentially responsive records" would "contain one or more" of its chosen search terms. J.A. 123 ¶ 17.

That explanation does not constitute "reasonabl[e] detail" as to why HHS limited its search and omitted obvious

alternative terms for the subject matter of American Oversight's request. *Valencia-Lucena*, 180 F.3d at 327. The statement that it is "reasonably likely" that using "more general terms" would result in "excessive" records is, at best, vague. Terms like the full statute names and the phrase "Obamacare" and even "repeal and replace" are no more general than the acronyms HHS used. Moreover, the statement that abbreviations like ACA and AHCA are "frequently used" does nothing to dispel the commonsense point that the unabbreviated forms and common terms like "Obamacare" or "repeal and replace" would also have been used often, even if not *as* frequently as HHS's chosen terms. In the end, the agency offered no explanation for omitting those familiar terms except for its concerns about overbroad results. HHS "may not conduct an underinclusive search based on nothing more than the unexplained and conclusory assertion that a broader search[] might have been unduly burdensome." *Shteynlyuger v. Ctrs. for Medicare & Medicaid Servs.*, No. 20 Civ. 2982 (RDM), 2023 WL 6389139, at *16 (D.D.C. Sept. 30, 2023). We are therefore left with "material doubt" that the "search was 'reasonably calculated to uncover all relevant documents.'" *Valencia-Lucena*, 180 F.3d at 325 (quoting *Truitt*, 897 F.2d at 542).

Moreover, though not required given the inadequacy of HHS's affidavit, American Oversight has provided "positive indications of overlooked materials" to rebut the affidavit. *Id.* at 327 (quotation marks omitted). American Oversight submitted transcripts and identified other documents showing that HHS employees, then-HHS Secretary Tom Price, and members of Congress used the unabbreviated statute names and the terms "Obamacare" and "repeal and replace." Many of these statements use those terms without pairing them with the terms HHS included in its search. *See, e.g.*, J.A. 344, 353,

356–58, 360–61, 365, 368, 369, 371, 375–76, 378–79, 381, 386–89, 393–94, 397, 414, 416, 428–429, 431, 435.

American Oversight requests records of communications involving these individuals and others. And there is no reason to doubt that HHS and members of Congress and their staffs also used these terms in private communications. With that context, HHS's conclusory statement that the abbreviations were "frequently used in the day-to-day operations" at HHS, "as opposed to the unabbreviated versions," does not suffice. J.A. 122 ¶ 16. We therefore conclude that HHS's search must include the unabbreviated statutory references and the terms "Obamacare" and "repeal and replace."

## VI

Accordingly, we reverse the district court's grant of summary judgment to HHS and OMB on the applicability of Exemption 5 to the records at issue and to HHS on the adequacy of its search; direct that American Oversight's motion for summary judgment be granted insofar as the communications between the agencies and Congress are not covered by Exemption 5, and HHS's search is inadequate; and remand for further proceedings consistent with our opinion.

*So ordered.*

WILKINS, *Circuit Judge,* concurring in part and dissenting in part: The principal question in this case is whether confidential communications about potential and pending legislation between members of Congress and officials within the Executive Branch should be considered intra-agency communications within the meaning of the Freedom of Information Act (FOIA), and thus exempt from disclosure to the public. The text, purpose, structure, and legislative history of the FOIA statute support application of the exemption. The ramifications of the majority's contrary interpretation of FOIA are actually quite breathtaking. The majority's rule will chill communications between Congress and the Executive, stymie the working relationship between Congress and the Executive, and inhibit the President's ability to perform effectively the core Article II duty of recommending legislation to the Congress. I therefore respectfully dissent.[1]

I.

We start of course with the statutory text. FOIA provides that each agency must make its records available to members of the public upon request, subject to certain exemptions. 5 U.S.C. §§ 552(a)–(b). At issue in this case is Exemption Five, also called the deliberative process privilege, which exempts from disclosure those "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency[.]" 5 U.S.C. § 552(b)(5). Because the definition of "agency" does not include Congress, 5 U.S.C. § 551(1)(A), the majority reasons that deliberative communications to or from Congress cannot constitute "intra-agency" communications of an Executive branch agency unless the Congress can be construed

---

[1] I agree with the analysis of my colleagues on the adequacy of search issues.

as a consultant, or agent, of that executive agency.[2]  Maj. Op. 10–17.

But the question does not depend solely upon the construction of the term "agency," because there is more relevant statutory text.  Congress also specified in FOIA that "[t]his section is not authority to withhold information from Congress."  5 U.S.C. § 552(d).  We have previously explained that "the obvious purpose" of this language was for "the Congress to carve out for itself a special right of access to privileged information not shared by others."  *Murphy v. Dep't of Army*, 613 F.2d 1151, 1155–56 (D.C. Cir. 1979).  As a result, we rejected a claim that the Army waived the deliberative process privilege (and Exemption Five protection) because it provided a deliberative document to a member of Congress.  *Id*.  To hold otherwise "would effectively transform section 552(c) into a congressional declassification scheme, a result supported neither by the legislative history of the Act, nor by general legal principles or common sense."  *Id*. at 1156.  [Section 552(c) is now Section 552(d).]  *See* Appellee Br. 25 ("It would undermine the statutory scheme if an agency's decision to exchange privileged and confidential communications with Congress resulted in the public gaining access to materials that would have remained confidential if they had been solely exchanged within the agency, or solely exchanged within Congress," citing *Murphy*).

As we explained, if "every disclosure to Congress [were] tantamount to a waiver of all privileges and exemptions, executive agencies would inevitably become more cautious in

---

[2]  As the majority acknowledges, there is no contention that a party in litigation with an Executive branch agency would be able to obtain the requested documents in discovery.  *See* Maj. Op. 5–6.

furnishing sensitive information to the legislative branch [–] a development at odds with public policy which encourages broad congressional access to governmental information." *Murphy*, 613 F.2d at 1156. We expressly followed *Murphy*'s reasoning in *Rockwell Int'l Corp. v. U.S. Dep't of Just.*, 235 F.3d 598, 604 (D.C. Cir. 2001), where we held that the Justice Department did not waive Exemption Five protection by sharing deliberative documents with a Congressional subcommittee.

As we noted in *Murphy*, the final House Committee report prior to the passage of FOIA specifically stated that the purpose of Section 552(d) was to ensure that "a law controlling public access has absolutely no effect upon congressional access to information." 613 F.2d at 1156 n.12 (quoting H.R. Rep. No. 1497, 89th Cong., 2d Sess. 11–12 (1966)). This statement is quite significant, because during hearings on the legislation, several executive and independent agencies noted they had confidentially shared deliberative documents with Congress for decades, and most of those agencies expressed concern about the potential for public disclosure of those records if FOIA were enacted.[3] This Committee Report shows that

---

[3] *See* Hearings Before the Senate Judiciary Committee, Subcommittee on Administrative Practice and Procedure, on S. 1666, 88th Cong. 1st Sess., 318–19 (Oct. 28–31, 1963) (Securities and Exchange Commission noted that it treated as confidential and not subject to disclosure "[l]etters or reports to Members of Congress, committees of Congress, and other Government agencies or officials, unless and until such documents are made public by such recipients"); Hearings Before the House Government Operations Committee, Subcommittee on Government Information and Foreign Operations on H.R. 5012 *et al*., 89th Cong., 1st. Sess., 233 (March 30-31; April 1–2, and 5, 1965) [hereinafter "1965 House Hearings"] (Atomic Energy Commission treats as confidential "correspondence with Members of Congress or congressional committees," except if

Congress, through Section 552(d), rejected that construction of the statutory text.  As Representative Dante Fascell, a sponsor of the legislation retorted, such concerns "could not be further from the fact[,] because "[c]ertainly a communication between the Treasury Department and the Congress . . . would be protected by a provision of the legislation which protects interagency messages on matters of policy."  1965 House Hearings at 174.  As Representative Fascell clarified, "[i]f the particular item of information is of the type which must be kept within the official Government family – *and that includes the Congress* – it should be withheld from all the public."  *Id*. (emphasis added).  As another sponsor, then-Representative Donald Rumsfeld explained, "[t]he very special relationship between the executive and legislative branches is not affected by this legislation."  89 Cong. Rec. 13020 (June 20, 1966). Representative John E. Moss, remembered as the "father" of FOIA, *see* Robert Mcg. Thomas Jr., "John E. Moss, 84, Is Dead; Father of Anti-Secrecy Law," N.Y. Times, Dec. 6, 1997, responded to concerns about potential public disclosure of a deliberative Treasury Department report to Congress by declaring that "[the report] is an internal memorandum covered here under 'interagency or intra-agency memoranda or letters dealing solely with matters of law or policy,'" and thus covered by the language of Exemption Five in the then-pending bill. 1965 House Hearings at 71–72; *see also id*. at 3 (setting forth language of the bill).

Interpreting Section 552(d) to mean that Exemption Five should not be construed in a manner to upset the historic relationship between the Executive and Congress comports

released by Congress or if related to a licensing, adjudication or a rulemaking); *id*. at 253 (Interstate Commerce Commission "ha[s] always believed that letters from the Commission to congressional committees or to individual Members of the Congress should not be disclosed by the Commission").

with the structure and purpose of FOIA. Congress, in its wisdom, exempted its own records and communications (deliberative or otherwise) from public disclosure through FOIA. *See* 5 U.S.C. § 551(1)(A) ("'agency' . . . does not include . . . the Congress"); *see also id*. § 552(f)(1) (defining "agency" pursuant to section 551(1)). It makes no sense that this same Congress intended to disclose its own confidential, deliberative communications with executive agencies, while simultaneously exempting confidential, deliberative communications sent from one executive agency to another. Nor does it make sense that Exemption Five would protect a deliberative document sent from one executive agency to another – even though both agencies generally fall within the scope of FOIA – but it would not protect the same document from disclosure if either agency shared the document with Congress, even though Congress is not subject to FOIA.

The anomalies of the majority's logic do not end there. Congress also exempted the President and his or her top aides from the definition of agency. *See Kissinger v. Reporters Committee for Freedom of the Press*, 445 U.S. 136, 156 (1980) (construing then-5 U.S.C. § 552(e), now § 552(f)). Yet no one would seriously contend that an agency's deliberations and recommendations lose Exemption Five protection when sent to the President or a top aide, based on a construction that the communications were neither sent from one "agency" to another "agency," nor kept within the same "agency." *See EPA v. Mink*, 410 U.S. 73, 85 (1973) (it was "beyond question" that unclassified documents attached to a report provided to the President by an interdepartmental group called the "Under Secretaries Committee" were "'inter-agency or intra-agency' memoranda or 'letters'" that fell within Exemption Five); *see also Judicial Watch, Inc. v. Dept. of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005) (finding "inconceivable" that Congress intended for Exemption Five to protect deliberative

documents of "agency" officials overseen by the President, but "not [such documents] when the decision is to be made by the President himself and those same agency officials are acting in aid of his decision-making processes").

*Klamath* is not to the contrary. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1 (2001). While the Court held that the terms "intra-agency" and "inter-agency" must be given "independent vitality," *id*. at 12, as the government argues, *see* Appellee Br. 18, the Court also acknowledged that those terms could reasonably be construed as not necessarily having cramped, wooden meanings:

> It is textually possible and … in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity *other than on behalf of another agency*—e.g., in a capacity as employee or consultant to the agency, *or as employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency.*

*Klamath,* 532 U.S. at 9–10 (quoting *U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting)) (emphases added). Because *Klamath* involved a report prepared by "outside consultants hired by [an agency]," *id*. at 10, the Court resolved only the question whether communications of such outside consultants fall within Exemption Five. *Klamath* had no occasion to resolve whether Exemption Five covered communications from an "employee or officer of another governmental unit (not an agency) that is

authorized or required to provide advice to the agency," which the Court acknowledged was another "textually possible" way non-agency communications could nonetheless come within the scope of Exemption Five. 531 U.S. at 10, 12. *Klamath* also had no occasion to consider how Section 552(d) impacts the construction of Exemption Five specifically, or how FOIA impacts the relationship between the Executive and members of Congress generally.

In other words, *Klamath* did not "eviscerate" our holdings in *Murphy* or *Rockwell* interpreting Section 552(d) and its impact on the relationship between Congress and the Executive, because the Court did not touch upon those issues. *See* Maj. Op. 13 (citing *Dellums v. U.S. Nuclear Reg. Comm'n*, 863 F.2d 968, 978 n.11 (D.C. Cir. 1988)). *Murphy* and *Rockwell* are good law, and we are bound to follow that precedent. *See LaShawn A v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc). Further, because *Klamath* involved communications between an executive agency and a non-governmental entity, the Court's holding does not necessarily apply to communications between an executive agency and Congress. I share my colleagues' concerns that we must be faithful to Supreme Court precedent, but I do not believe that concern requires applying the consultant corollary doctrine to Congress, particularly given Congress's intent that FOIA's passage would preserve, rather than impair, its relationship with the Executive.[4] Deploying the consultant corollary doctrine in these circumstances seems rather like forcing a square peg into a round hole.

---

[4] I note that we have repeatedly held that *Ryan v. Dept. of Justice*, 617 F.2d 781 (D.C. Cir. 1980) and subsequent precedent applying *Ryan's* reasoning have not been overruled by *Klamath*. *See Judicial Watch, Inc. v. Dept. of Energy*, 412 F.3d 125, 129–31 (D.C. Cir. 2005); *Nat'l Inst. of Military Justice v. U.S. Dept. of Defense*, 512 F.3d 677, 679–87 (D.C. Cir. 2008).

The majority contends that my reasoning is "entirely different" than the government's, *see* Maj. Op. 15-17, but I beg to differ. As have I, the government cited Justice Scalia's observation, quoted in *Klamath*, that "it is both 'textually possible and much more in accord with the purpose' of Exemption [Five] to read the term 'intra-agency memorandum' more expansively." Appellee Br. 18 (quoting *Julian*, 486 U.S. at 18 n.1 (Scalia, J. dissenting). As have I, the government cited *Murphy* and *Rockwell* to argue "[i]t would undermine the statutory scheme if an agency's decision to exchange privileged and confidential communications with Congress resulted in the public gaining access to materials that would have remained confidential if they had been solely exchanged within the agency, or solely exchanged within Congress." Appellee Br. 25. Based upon all of this, the government articulated the governing test as primarily focused on "whether the communications were 'part and parcel of the agency's deliberative process.'" Appellee Br. 20 (quoting *Rockwell*, 235 F.3d at 604). *See also id*. at 21 (documents at issue fell within Exemption Five because "the agencies communicated confidentially with members of Congress and their staff who possessed relevant views and other non-public information that *would help the Executive Branch perform Executive Branch functions*.") (emphasis added); *id*. at 27 ("[t]he dividing line for Congressional communications is whether they are 'part and parcel of *the agency's* deliberative process'") (quoting *Dow Jones & Co. v. U.S. Dep't of Justice*, 917 F.2d 571, 575 (D.C. Cir. 1990)) (emphasis in the brief). While the government did not say explicitly, as have I, that the consultant corollary doctrine is completely ill-fitted to Executive-Congress advice, there is very little daylight between the government's bottom-line position and mine, based on our respective understandings of *Klamath* and the precedent in this circuit.

To that end, I note that the majority has no response to *Klamath's* observation that it is "textually possible" for Exemption Five to cover communications from an "employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency." 531 U.S. at 9–10, 12. Furthermore, while I agree with the majority that this case is not explicitly about whether the deliberative process privilege has been waived, that does not make our understanding of the purpose of Section 552(d), as explained in *Murphy* and *Rockwell*, irrelevant. The majority appears to agree that Section 552(d) demonstrates that Congress did not intend waiver of the privilege when an executive agency provides draft bill language to a member of Congress, presumably even if it were given to a member of Congress from a different party who does not support the bill. *See* Maj. Op. 16. Yet, the majority holds that if a Congressmember fully supportive of the draft bill sends it back to the agency with proposed edits and comments to aid the President's deliberations, then that communication falls completely outside the privilege, effectively subjecting the draft bill to public disclosure. Why would Congress intend to protect its right to receive information confidentially from the Executive, but not intend to protect its right to advise the Executive confidentially in response to the information it receives? How is such an outcome consistent with the fact that Congress did not intend for FOIA to impact the "very special relationship" between Congress and the Executive? The majority has no answers. Moreover, unless the Executive believes that members of Congress are like potted plants and will not provide their own feedback and advice in response to information given to them, the Executive will be disinclined to share sensitive deliberations with Congress. This is precisely the opposite effect intended by FOIA, as expressed in Section 552(d) and explained in *Murphy* and *Rockwell*.

10

The majority's holding has significant constitutional implications. Article II, Section 3 provides that the President "shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient. . . ." This provision, called the Recommendation Clause, *requires* "the [P]resident to lay before [C]ongress all facts and information, which may assist their deliberations" and thus to "point out the evil, and to suggest the remedy." 3 J. Story, Commentaries on the Constitution of the United States § 1555, p. 413 (1833). In order for the President to "initiate and influence legislative proposals," *Clinton v. City of New York*, 524 U.S. 417, 438 (1998), he and his emissaries need to be able to consult Congress. The President cannot make effective recommendations in a vacuum; without a good understanding of how Congress sees the problem and what its members will (or will not) support, he cannot know what, if any, legislation is worth expending valuable political capital to recommend. For good reason, we have found these types of internal communications to be part of the Executive's deliberative process in the past. *See Access Reports v. Dept of Justice*, 926 F.2d 1192, 1196–97 (D.C. Cir. 1991) (holding that staff memorandum related to "the Department's study of how to shepherd the FOIA bill through Congress" is covered by Exemption 5, and the exemption also protects records "contributing to deliberations about whether to introduce legislation in the first instance").

Here, the district court found, and it appears undisputed on appeal, that the documents at issue involved discussions between "members of Congress and congressional staff of the Republican Party who shared an interest with agencies in the current Republican administration in working to repeal the [Affordable Care Act] and replace it with the health care reform legislation that was under consideration." J.A. 609 (quoting an

executive official's declaration). These discussions fall squarely within the President's responsibilities under the Recommendation Clause. A ruling that these communications fall outside of Exemption Five will force the President to either make uninformed, less effective recommendations or to fulfill this constitutional duty in a fishbowl. Neither of those outcomes is consistent with the FOIA statute or the Constitution.

It is no answer to say that Congress should not be considered to have consulted the President in this case because Congress has an "independent stake" in the legislation. *See* Maj. Op. 17–23. One branch of government is impotent without the other. The President can recommend a bill, but a member of Congress has to introduce it. Congress can pass a bill, but absent extraordinary circumstances, it cannot become law without the President's signature. To get a bill through Congress, the President must advocate for the bill, both publicly and privately during Congressional consideration. The interests of the Congressmembers communicating with executive officials in this case were more aligned than not, especially since these particular Congressmembers shared the President's overall agenda with regard to health care legislation. Furthermore, a ruling that Congress consulted the President within the meaning of Exemption Five does not diminish Congress as a co-equal branch. Members of this Court consult each other daily during their deliberations; none of that portends that any one judge is subordinate to the other. So too with Congress and the Executive.

In sum, I do not believe that *Klamath's* conflict of interest holding controls the key question in this case: whether the congressional officials "[are] authorized or required to provide advice to the agency." *Klamath*, 532 U.S. at 10 (quoting *Julian*, 486 U.S. at 18 n.1). Because members of Congress are

obviously authorized to provide advice to the Executive, I would find that these communications fall within Exemption Five.

## II.

Even if *Klamath*'s consultant corollary test governed this case, I nonetheless believe it is an error to conclude there is a fatal conflict of interest present in these factual circumstances.

*Klamath* held only that "the intra-agency condition excludes, at the least, communications to or from an interested party seeking a Government benefit at the expense of other applicants," 532 U.S. at 12 n.4, such as communications by a party seeking "a claim . . . that is necessarily adverse to the interests of competitors," *id*. at 14. Members of Congress are not "seeking government benefits" or seeking "claims" from the government; they are the government.

Further, *Klamath* explained that Exemption Five can apply where a consultant "functions just as an employee would be expected to do" because the consultant's "only obligations are to truth and its sense of what good judgment calls for. . . ." 532 U.S. at 11. We have no basis to hold that members of Congress and their staff do not have an "obligation to the truth and . . . good judgment," as described in *Klamath*. Just as the President is bound by oath to "faithfully execute[]" his duties and support and defend the Constitution, U.S. Const. art. II, § 1, cl. 7, members of Congress take a similar oath, U.S. Const. art. VI, cl. 3.

In that vein, I am compelled to point out that appellants introduced absolutely no evidence in the district court to support their arguments about a conflict of interest. There was no declaration from a current or former member of Congress, a

current or former staffer, or an expert witness (like a political science professor). The government asserted, as an undisputed fact, that "[the Department of Health and Human Services and the Office of Management and Budget] and the members of Congress and their staff who exchanged the emails at issue in this case shared a common interest in enacting health care reform legislation." 1:17-cv-00827-EGS Document 30-4 at 4–5. Critically, as required by the federal rules, the government backed up this factual assertion with evidence (in the form of declarations from senior HHS and OMB officials). *Id*. *See also* Fed. R. Civ. P. 56(c)(1). The plaintiff asserted, without citing any evidence and adverting only to their briefs, that they disputed this fact, *id*., but that was plainly insufficient to dispute it. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–27 (1986) (construing Fed. R. Civ. P. 56). Accordingly, the District Court credited the evidence that Congress and agencies shared a common interest. J.A. 609. Thus, the plaintiff's argument that Congress had an actual conflict of interest with the Executive has no support in the evidentiary record before us.

Undeterred by the lack of evidence, the majority not only finds that appellants have placed a fact in dispute which they failed to properly dispute; the majority proceeds to the next step to hold that appellants indisputably proved the conflict of interest, even without evidence. (Of course, if plaintiff had properly disputed the conflict-of-interest issue by submitting evidence to the district court, it could have held a hearing to resolve the disputed fact, and we would then review that finding. *See Pavement Coatings Tech. Council v. U.S. Geological Surv.*, 995 F.3d 1014, 1024 (D.C. Cir. 2021).) My colleagues can say they may take judicial notice that Congress and the Executive are rival branches of government; but if we go down that road, I would think we should also take judicial notice that members of Congress often share the interests of the

President on specific pieces of legislation, particularly when the President is a member of the same party. *Cf. Mistretta v. United States*, 488 U.S. 361, 408 (1989) ("Our principle of separation of powers anticipates that the coordinate Branches will converse with each other on matters of vital common interest.").

\* \* \*

When Congress passed FOIA in 1966, the historic recognition of the privilege against disclosure of internal governmental deliberations was to remain intact. Congress also expressed that FOIA was not intended to affect Congress's ability to obtain information from the Executive or share information with the Executive. When executive agencies or Congress correspond with members of the public, there is no expectation of confidentiality in those communications, so it only makes sense to treat those communications differently than communications between different branches of the government (where there is such an expectation). Further, an interested member of the public has no right or expectation that they can advise executive officials confidentially and ex parte, which is yet another reason to treat a private party's communications differently than those of a member of Congress (who has a valid expectation that she can confidentially consult the Executive, and do so ex parte). For all those reasons, the text, structure, purpose and history of FOIA support *Klamath's* holding that Exemption Five only applies to a private party's communications with an agency if that private party is a consultant to the executive agency and has no conflicting private interest in the decision to be rendered by the agency.

On the other hand, FOIA was not intended to grant citizens access to any information that had been previously subject to

privilege. The executive officials and Congressmembers involved in this case had an expectation that their deliberations and communications with each other would be confidential, and it is conceded there is no history of these types of communications being subject to discovery by private citizens in civil or criminal litigation. In other words, nothing about the nature, circumstances, or history of communications between the Executive and Congress supports extending the conflict of interest holding of *Klamath* to the present context.

To sum up, the majority rule 1) violates the text and purpose of Section 552(d) with respect to Congress's right to share information with, and receive information from, the Executive, 2) impedes the Constitutional duty of the Executive to consult with Congress on legislation, 3) effectively creates a waiver of the deliberative process privilege when two co-equal branches consult each other, and 4) grants public access to confidential deliberative documents that members of the public could not obtain if they were in litigation with the Executive. *Klamath* does not compel such a sweeping change to the status quo. This is not an instance where "Congress has not enacted the FOIA exemption the [agencies] desire," Maj. Op. 17 (quoting *Milner v. Dept. of Navy*, 562 U.S. 562, 581 (2011)). This is an instance where the majority regrettably fails to harmonize Section 552(d) and Exemption Five to implement Congressional intent, as expressed by, among others, the "father" of FOIA. I respectfully dissent.